Howard C. REEVES, Appellant,

v.

STATE of Alaska, Appellee.

No. 3161.

Supreme Court of Alaska.

Sept. 14, 1979.

Robert Adelman, Anchorage, of counsel, Barbara J. Miracle, Sue Ellen Tatter, Asst. Public Defenders, Brian Shortell, Public Defender, Anchorage, for appellant.

Thomas B. Turnbull, III, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

RABINOWITZ, Justice.

Howard Reeves was arrested in Anchorage on March 10, 1976, by Anchorage Police Officer C. M. Hayman for driving while under the influence of intoxicating liquor, a violation of Anchorage Municipal Code 9.28.020.[1] In the process of making this arrest, Officer Hayman discovered that there was a bench warrant outstanding for Reeves because of his failure to appear in connection with a traffic violation. The officer transported Reeves to the police station for the purpose of administering a breathalyzer test to him. The results of the test were positive.[2] Officer Hayman then took Reeves to the state jail annex at 6th and C streets in Anchorage. The officer filled out a booking slip and then left the jail.

During the process of booking Reeves into the jail, Correctional Officer J. L. Martin first asked Reeves to empty his pockets and then conducted a "pat-down" search of his person. The correctional officer felt a small object in the right-hand, snap-down pocket of Reeves' leather jacket and removed that object from the pocket. The object thus removed from Reeves' pocket was an opaque, bluish-green or turquoise toy balloon which was tightly wrapped in a configuration approximately one-half inch in width.

The correctional officer unwrapped the balloon and in it discovered a small quantity of a brownish-colored powdery substance.

He handed the unrolled balloon to the jail desk officer. The correctional officers then called Police Officer Hayman at the police station and "advised [him] that they had found something that they wanted [him] to look at that they considered suspicious."

Officer Hayman returned to the jail and examined the balloon and its contents. He then took the balloon to the police station where he conducted a field test of a small quantity of its powdered contents. The field test indicated that opium derivatives were present. A sample of this substance was sent to a laboratory for analysis and that analysis confirmed the presence of the opium derivative heroin. Reeves was subsequently indicted for possession of a narcotic drug in violation of AS 17.10.010.[3]

The law enforcement officials involved did not obtain or apply for a warrant to search Reeves or the balloon discovered on his person at any time during this sequence of events. Based on this fact, Reeves moved to suppress this evidence against him on the ground that it was "the product of an unlawful search and seizure in violation of the United States and Alaska Constitutions." The motion was denied by the superior court after an evidentiary hearing and argument from the parties.

■ Thereafter, Reeves entered a plea of nolo contendere to the charge of possession of the narcotic drug heroin. In entering this plea, Reeves expressly reserved the right to appeal the search and seizure issue raised in the superior court.[4] Reeves was given a sentence of three years, "with all

---

1. At the time of Reeves' arrest, Anchorage Municipal Code 9.28.020 provided, in pertinent part:

   A. It is unlawful for any person who is under the influence of intoxicating liquor to drive or be in actual physical control of any vehicle within the city.

2. The breathalyzer reading was ".175 or .170, somewhere in that neighborhood." This was sufficient to raise a presumption that Reeves was under the influence of intoxicating liquor. *See* Anchorage Municipal Code 9.28.023(A)(3). *See also* AS 28.35.033(a)(3).

3. AS 17.10.010 provides:

   *Acts Prohibited.* It is unlawful for any person to manufacture, possess, have under

his control, sell, prescribe, administer, dispense, give, barter, supply or distribute in any manner, or compound any narcotic drug except as authorized in this chapter.

4. This reservation of a limited right to appeal was made by agreement of the parties and was recognized by the superior court. Furthermore, the resolution of the issue reserved for appeal will be dispositive of the entire case, since Reeves' conviction would be reversed and further prosecution on this charge barred if he should prevail. Reeves' appeal is not precluded because the parties did not expressly stipulate with trial court approval "that our resolution of the issue reserved for appeal will be dispositive of the entire case," since Reeves' plea was entered well before the imposition of

suspended except that imposed pursuant to the parole revocation by the Federal District Court which time will be served concurrently with the Federal Sentence," and placed on formal probation.[5]

One of Reeves' arguments on appeal is that the search of his person at the Anchorage jail was constitutionally impermissible because it was undertaken before he was given a reasonable opportunity to post bail. However, Reeves did not make this argument to the superior court in support of his motion to suppress. Nor did he challenge the basic authority of the correctional officer to search his person either in his motion or in reserving the issue raised by that motion for appeal. Instead, the sole issue raised in the superior court and expressly reserved for appeal was whether the scope of the search conducted by the correctional officer and the police officer here was broader than that allowed by a pre-incarceration inventory search exception to the warrant requirement.[6]

▇▇▇ A plea of guilty or nolo contendere is a waiver of all non-jurisdictional defects and forecloses appellate review to that extent. We may not review an issue not properly reserved for appeal when entering such a plea.[7] Since Reeves expressly conceded the validity of a limited inventory search by the correctional officer here when reserving his rights on appeal, we do not address the merits of his arguments made on appeal challenging the validity of that search because it was effected before he was given a reasonable opportunity to raise bail.[8] Accordingly, we do not reach the question whether the requirements articulated in our decision in *Zehrung v. State*, 569 P.2d 189 (Alaska 1977), *modified on rehearing*, 573 P.2d 858 (Alaska 1978),

that additional requirement in *Oveson v. Municipality of Anchorage*, 574 P.2d 801, 803 n.4 (Alaska 1978). Review of the issue reserved on appeal is thus appropriate under *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974). *See Gonzales v. State*, 586 P.2d 178, 179 n.5 (Alaska 1978); *Cruse v. State*, 584 P.2d 1141, 1144 n.3 (Alaska 1978).

5. On August 26, 1975, Reeves had been sentenced by the Federal District Court for the District of Alaska to 90 days of imprisonment and a special parole term of two years after entering a guilty plea to a charge of "[p]ossession with intent to distribute controlled substance in violation of 21 U.S.C. § 841(a)(1)." The evidence seized supporting that charge included approximately 27 grams of a white powder with a 54% concentration of cocaine and a spoon used for cocaine consumption.

6. At the suppression hearing, Reeves' counsel argued that the discovery of the balloon during the search simply provided probable cause for obtaining a search warrant. Since there were no exigent circumstances where the suspected contraband was seized and under the control of jail authorities, he argued that a search warrant should have been obtained to seize and test the powdered material in the balloon. He conceded the validity of the inventory search itself, but argued that the search here exceeded the permissible scope of such a search.

Similarly, when Reeves entered his plea of nolo contendere, the correctional officer's right to conduct an inventory search was not disputed or reserved as an issue for appeal. As Reeves' counsel explained at that time:

It's our position that, first, that the booking officer has the right certainly to log and inventory all belongings, but at the point in which he has probable cause to believe that there is something that could be examined, or that there is evidence that something is an illegal substance, at that point with no exigent circumstance he has an obligation to get a warrant. In this case I would contend that there were at least 3 searches conducted, the first by the booking officer by unwrapping the balloon, perhaps a second one, or at least a greater intrusion by removing the powder determining from an opaque balloon what was in it; secondly, by the police officer removing the powder and field testing the substance; and third, by the removal of that to the Alaska Medical Lab where further testing was done on it. All of these matters could have been done pursuant to a warrant and it was our position that that should have been done and that's the issue that we wish to reserve and litigate on appeal.

7. *Gordon v. State*, 577 P.2d 701, 703 (Alaska 1978). *See Cooksey v. State*, 524 P.2d 1251 (Alaska 1974). *See also Oveson v. Municipality of Anchorage*, 574 P.2d 801, 803 n.4 (Alaska 1978).

8. By declining to address this issue, we do not hold that a defendant must expressly reserve the details of his legal argument when entering a plea of nolo contendere. Such arguments may be expanded or refined on appeal. *See, e. g., State v. Gallo*, 20 Wash.App. 717, 582 P.2d 558, 563 (1978).

should apply retroactively to the search challenged here.[9]

The state argues that we should review this search as one incident to arrest. However, in this case the arresting police officer had completed the arrest and returned to the police station from the jail when the challenged search was conducted by a correctional officer. Correctional Officer Martin testified that the search was effected as a routine pre-incarceration or "booking" inventory search. It is clear on this record that the search was undertaken as one incident to incarceration rather than one incident to arrest[10] and it must be reviewed as such.[11]

While we have several times in our past opinions taken notice of the issue as to the

---

**9.** In *Zehrung v. State,* 569 P.2d 189 (Alaska 1977), *modified on rehearing,* 573 P.2d 858 (Alaska 1978), we summarized our holding as follows:

> [W]e hold that when one is arrested and brought to a jail for a minor offense for which bail has already been set in a bail schedule, he should be allowed a reasonable time to attempt to raise bail before being subjected to the remand and booking procedures and the incident inventory search.

*Id.* at 195.

The search of Reeves appears to have been similar in many respects to the search held impermissible in *Zehrung.* Both men were arrested on relatively minor offenses for which bail was established by a pre-set schedule and subjected to an inventory search at the Anchorage jail before being allowed a reasonable opportunity to raise bail. In this case, the pre-set bail for Reeves was $300 for the driving while intoxicated charge and $50 for the outstanding bench warrant. Reeves had $480 in cash on his person when arrested and was able to post bail and avoid incarceration even after an additional $1500 bail requirement was imposed for the charge of possession of the heroin found during the challenged search.

One distinction between the situation here and that presented in *Zehrung* is the fact that Reeves was presumably intoxicated to some degree when he was taken into custody. Even if bail is furnished, in order to protect the public and the arrestee, law enforcement officials in some cases might reasonably detain an intoxicated arrestee until he is sufficiently sober or a responsible person arrives to take custody of him. The record here does not allow a conclusion as to whether detention of Reeves for that reason was necessary.

However, this search occurred on March 10, 1976, while our mandate in *Zehrung* was not issued until September 29, 1977. For a discussion of the factors which we consider in deciding the retroactive effect, if any, of a decision by this court, see *Gordon v. State,* 577 P.2d 701, 705–06 (Alaska 1978); *Lauderdale v. State,* 548 P.2d 376, 382–84 (Alaska 1976); *Rutherford v. State,* 486 P.2d 946, 952–59 (Alaska 1971); *Judd v. State,* 482 P.2d 273, 277–79 (Alaska 1971); *Gray v. State,* 463 P.2d 897, 913 (Alaska 1970). We have in the past limited the retroactive effect of our opinions on search and seizure requirements. *Compare* *State v. Glass,* 596 P.2d 10 (Alaska 1979), *with* *Judd v. State,* 482 P.2d 273 (Alaska 1971), *and* *Fresneda v. State,* 458 P.2d 134 (Alaska 1969).

**10.** The record does not reveal whether the arresting officer in this case conducted a search incident to arrest when he arrested Reeves and transported him to the police station and, later, to the jail. Our conclusion in this regard does not mean that a search incident to arrest may not be conducted at a jail or police station or contemporaneously with a pre-incarceration inventory search.

**11.** The distinction between these two types of searches is an important one based on the respective justifications for allowing them to be conducted without a warrant.

> Inventory searches should not be confused with searches incident to arrest. An officer is permitted to conduct a warrantless search of the person of an arrestee and of the area within the arrestee's immediate control. This search is generally limited in scope to one designed to reveal weapons which might be used to harm the officer and for evidence of the crime for which the person has been arrested. Inventory searches, which generally occur at the jail prior to incarceration, are not so limited. The espoused purposes of inventory searches are to prevent breaks in the chain of custody of evidence, to protect the state against claims of theft or loss of inmates' personal effects, and to keep the prison secure from contraband materials.

Feldman, *Search and Seizure in Alaska: A Comprehensive Review,* 7 U.C.L.A.—Alaska L.Rev. 75, 97–98 (1977). *See also People v. Dixon,* 392 Mich. 691, 222 N.W.2d 749, 756 (1974); Comment, *The Inventory Search of an Offender Arrested for a Minor Traffic Violation: Its Scope and Constitutional Requirements,* 53 B.U.L.Rev. 858, 864 (1973). In *State v. Daniel,* 589 P.2d 408, 411 (Alaska 1979), we recognized the distinctions between the routine automobile inventory search conducted there and a search incident to arrest.

Our most recent comprehensive discussion of the requirements of searches incident to arrest was in *Zehrung v. State,* 569 P.2d 189, 195–200 (Alaska 1977), *modified on rehearing,* 573 P.2d 858 (Alaska 1978). *See also Middleton v. State,* 577 P.2d 1050, 1055 (Alaska 1978); *Wel-*

constitutional validity and scope of pre-incarceration or "booking" inventory procedures, to date we have not been presented with a case which required the resolution of this issue.[12] However, this question must be resolved here in order to determine the validity of the correctional officer's seizure and search of the balloon found on Howard Reeves' person during a routine pre-incarceration inventory.[13]

At the outset, there can be no doubt that a pre-incarceration inventory

procedure such as that followed in this case is a "search" in the sense that the term is employed in article I, section 14 of the Alaska Constitution.[14] The governmental intrusion inherent in a pre-incarceration inventory search of an arrestee's person is no less an intrusion because it is routine in nature. Nor does the fact that such an inventory is conducted at least in part for the purpose of securing and protecting the arrestee's property alter the fact of intrusion.[15]

tin v. State, 574 P.2d 816, 817–20 (Alaska 1978); Schraff v. State, 544 P.2d 834 (Alaska 1975); Layland v. State, 535 P.2d 1043 (Alaska 1975); State v. Spietz, 531 P.2d 521 (Alaska 1975); Lemon v. State, 514 P.2d 1151, 1157–59 (Alaska 1973); Avery v. State, 514 P.2d 637, 639–40 (Alaska 1973); McCoy v. State, 491 P.2d 127 (Alaska 1971).

12. See Zehrung v. State, 569 P.2d 189, 200 (Alaska 1977); Schraff v. State, 544 P.2d 834, 841 n.9 (Alaska 1975); Daygee v. State, 514 P.2d 1159, 1165 n.13, 1166 (Alaska 1973); McCoy v. State, 491 P.2d 127, 139 n.60 (Alaska 1971). See also Griffith v. State, 578 P.2d 578, 580 n.3 (Alaska 1978); Schraff v. State, 544 P.2d 834, 851 n.9 (Alaska 1975) (Rabinowitz, C. J., dissenting).

While there is language in Peter v. State, 531 P.2d 1263, 1266 (Alaska 1975), to the effect that "with a valid arrest, the removal and inventory of [the arrestee's] effects would be justified," we did not define the scope of such an "inventory." Furthermore, the footnote to this statement, as well as the ensuing discussion in that opinion, made it clear that we were considering the Peter search as one conducted incident to arrest. Id. at 1266 n.7, 1272–73. Thus, we held:

An officer transporting a person incapacitated by drink has a valid reason to make a limited search for possible weapons which might be used to injure him. Accordingly, any items discovered by [the arresting officer] as a result of such a search made prior to transporting Peter to jail were not the product of an illegal search.

Id. at 1272 (footnote omitted). We expressly declined to approve the search of Peter at the jail, which may have been conducted as a pre-incarceration inventory, stating:

There is difficulty, however, with any additional items obtained at the time of the more detailed search performed when Peter was placed in jail.

Id. at 1272–73. We held this "more detailed search" illegal because, under the Uniform Alcoholism and Intoxication Treatment Act as adopted by Alaska, Peter "should have been

taken to a treatment facility or an emergency medical service" instead of jail. Id. at 1273.

13. While much of the analysis here will be similar to that in our recent opinion in State v. Daniel, 589 P.2d 408 (Alaska 1979), the precise question presented is distinct. Daniel addressed the permissible scope of a routine police inventory of an automobile pursuant to its impoundment. Here, we are concerned with a routine inventory search of an arrestee's person prior to incarceration. As our discussion here will make apparent, these two police procedures involve different, though overlapping, policy considerations and justifications.

14. The state concedes this point in its brief on appeal. See also Zehrung v. State, 569 P.2d 189, 192 (Alaska 1977).

Article I, section 14 of the Alaska Constitution provides, in part:

The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated.

We note that there is some uncertainty whether a routine police inventory is considered a search within the meaning of the fourth amendment to the United States Constitution. See South Dakota v. Opperman, 428 U.S. 364, 370 n.6, 96 S.Ct. 3092, 3097 n.6, 49 L.Ed.2d 1000, 1006 n.6 (1976).

15. See State v. Daniel, 589 P.2d 408, 417 (Alaska 1979). As the Supreme Court of Hawaii stated in reaching an identical conclusion:

Of course, a 'jailhouse search' is no less a search under the federal and state constitutions simply because it may have non-investigatory purposes. It is the fact alone of the government intrusion into individual privacy which invokes constitutional restraints.

State v. Kaluna, 55 Haw. 361, 520 P.2d 51, 61 (1974). See also Mozzetti v. Superior Court, 4 Cal.3d 699, 94 Cal.Rptr. 412, 416, 484 P.2d 84, 88 (1971); State v. Opperman, 247 N.W.2d 673 (S.D.1976).

It is not at all certain that the fourth amendment to the United States Constitution, as presently construed, places any significant limitations on the scope of an inventory search conducted pursuant to a custodial arrest.[16] In *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427, 440–41 (1973), the United States Supreme Court held:

A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.

While *Robinson*, in contrast to the present case, was addressing the scope of the search incident-to-arrest exception to the warrant requirement, we think a fair implication of its reasoning is that "an individual lawfully subjected to a custodial arrest retains no significant Fourth Amendment interest in the privacy of his person."[17]

We reject this limited conception of the privacy interest retained by an arrestee in the context of a pre-incarceration inventory search as we have rejected it in connection with searches incident to arrest. As we held in *Zehrung v. State,* 569 P.2d 189, 199 (Alaska 1977):

That an [arrested] individual has an actual expectation of privacy in items carried on the person is obviously true. We also hold that the expectation of privacy is one which Alaskan society would recognize as reasonable.[18]

As we have frequently noted, the Alaska constitutional guarantee against unreasonable searches and seizures is broader in scope than fourth amendment guarantees under the United States Constitution, at least in part because of the more extensive right of privacy guaranteed Alaskan citizens by article I, section 22 of our state constitution.[19] Thus, it is within the frame-

---

**16.** *See South Dakota v. Opperman,* 428 U.S. 364, 49 L.Ed.2d 1000 (1976); *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). *But see United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

**17.** *United States v. Robinson,* 414 U.S. 218, 237, 94 S.Ct. 467, 494, 38 L.Ed.2d 427, 441 (1973) (Powell, J., concurring).

**18.** *See also People v. Brisendine,* 13 Cal.3d 528, 119 Cal.Rptr. 315, 326–31, 531 P.2d 1099, 1110–15 (1975); *State v. Kaluna,* 55 Haw. 361, 520 P.2d 51, 57–60 (1974).

This analysis of the privacy interests of an arrestee was based on the test announced in *Smith v. State,* 510 P.2d 793 (Alaska 1973). In *Smith,* this court adopted Justice Harlan's twofold test for determining the applicability of fourth amendment protections. The test we embraced requires "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable'." *Id.* at 797, *quoting Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 587–88 (1967) (Harlan, J., concurring).

The record here shows that Reeves did not voluntarily surrender the balloon when told to empty his pockets. He clearly "exhibited an actual (subjective) expectation of privacy" as to the balloon. *See also State v. Daniel,* 589 P.2d 408, 416 n.33 (Alaska 1979).

Pertinent to the context of this case, we note our agreement with the following statement in *Brett v. United States,* 412 F.2d 401, 406 (5th Cir. 1969):

We are not prepared to say that an accused whose effects are held by the police for safekeeping has, by the single fact alone of the police custody of the property, surrendered his expectations of the privacy of those effects.

*See also United States v. Jones,* 317 F.Supp. 856 (E.D.Tenn.1970); *State v. Kaluna,* 55 Haw. 361, 520 P.2d 51, 61 (1974).

**19.** *See Woods & Rohde, Inc. v. State, Dep't of Labor,* 565 P.2d 138, 150 (Alaska 1977). *See also State v. Daniel,* 589 P.2d 408, 416 (Alaska 1979); *Zehrung v. State,* 569 P.2d 189, 199 (Alaska 1977); *Ellison v. State,* 383 P.2d 716, 718 (Alaska 1963).

It is well established that we are not bound by the interpretation of federal constitutional guarantees and that we are free to develop and expound principles found concurrently in our own constitution. *See Cooper v. California,*

work of Alaska's constitutional guarantees that we must analyze and delineate the permissible scope of pre-incarceration inventory searches in order to determine the validity of the search of Reeves' person undertaken at the Anchorage jail following his arrest.

▮▮▮ We begin our discussion by reiterating that "a search without a warrant is per se unreasonable unless it clearly falls within one of the narrowly defined exceptions to the warrant requirement."[20] Each exception must, in turn, be defined in terms of the reasonable and justifiable governmental purpose which it furthers.[21] Finally, inherent in the concept of "narrowly defined exceptions" is the requirement that a search conducted pursuant to such an exception must be no broader or more intrusive than necessary to fairly effect the governmental purpose which serves as its justification.[22]

▮▮▮ There are two valid justifications for allowing a pre-incarceration inventory search exception to the warrant requirement. The first is the institutional interest in prohibiting the introduction of weapons, illegal drugs, and other contraband or potentially dangerous items into the jail environment. The second is the protection of the arrestee's property and the related interest of the jail administration in protecting itself against claims that loss or damage to that property occurred while the property was under the control of jail authorities.[23]

▮▮▮ In outlining the scope of the governmental intrusion permissible to effect the first of these justifications, we are in agreement with the reasoning of the Supreme Court of Hawaii in *State v. Kaluna*, 55 Haw. 361, 520 P.2d 51, 61 (1974) (footnote omitted and emphasis in original):

386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730, 734 (1967); *Zehrung v. State*, 569 P.2d 189, 197–199 (Alaska 1977); *Baker v. City of Fairbanks*, 471 P.2d 386, 401–02 (Alaska 1970). *See generally* Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv.L. Rev. 489 (1977).

20. *Erickson v. State*, 507 P.2d 508, 514 (Alaska 1973) (footnote omitted). *Accord, Woods & Rohde, Inc. v. State, Dep't of Labor*, 565 P.2d 138, 149 (Alaska 1977); *McCoy v. State*, 491 P.2d 127, 132 (Alaska 1971); *Bargas v. State*, 489 P.2d 130, 132 (Alaska 1971); *Ferguson v. State*, 488 P.2d 1032, 1037 (Alaska 1971); *Rubey v. City of Fairbanks*, 456 P.2d 470, 474 (Alaska 1969); *Sleziak v. State*, 454 P.2d 252, 256 (Alaska 1969), *cert. denied*, 396 U.S. 921, 90 S.Ct. 252, 24 L.Ed.2d 202 (1969).

See also *McCoy v. State*, 491 P.2d 127 (Alaska 1971) (footnote omitted), where we noted that the Supreme Court of the United States has held that:

[T]he principle of antecedent justification is so central to the Fourth Amendment that subject only to a few specifically established and well-delineated exceptions 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment.'

*Id.* at 132, *quoting Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 586 (1967) (footnotes omitted).

21. *See, e. g., Zehrung v. State*, 569 P.2d 189, 199 (Alaska 1977) ("It is a basic premise that governmental intrusions must have a justifiable

purpose in order to be recognized as reasonable.")

22. We previously stated this principle in *Zehrung v. State*, 569 P.2d 189, 199 (Alaska 1977):

[I]n our view, the right to be 'secure . . . against unreasonable searches and seizures,' under art. I, § 14 of the Alaska Constitution, requires that governmental intrusions into the personal privacy of Alaska citizens be limited in scope to that degree necessary under the particular circumstances. [footnote omitted]

*See also State v. Kaluna*, 55 Haw. 361, 520 P.2d 51, 61 (1974) ("While the police have valid reasons to conduct a limited pre-incarceration search, . . . such a search should be no broader than necessary in light of those reasons.")

23. In so holding, we accept each of the rationales which the state has presented to justify a pre-incarceration inventory search. These rationales were also recognized in somewhat different terms by the Hawaii Supreme Court in *State v. Kaluna*, 55 Haw. 361, 520 P.2d 51, 61–62 (1974). *See also* Feldman, *Search and Seizure in Alaska: A Comprehensive Review*, 7 U.C.L.A.—Alaska L.Rev. 75, 98 (1977) ("The espoused purposes of inventory searches are to prevent breaks in the chain of custody of evidence, to protect the state against claims of theft or loss of inmates' personal effects, and to keep the prison secure from contraband materials.")

To this end, [jail authorities] may require internees to surrender *any* possible repositories for such items prior to incarceration. However, a concomitant of this wide authority to prohibit the entry of personal belongings which may harbor forbidden contents is a complete *absence* of authority to conduct a general exploratory search of the belongings themselves. This absence of authority derives from the lack of any justification for such a further search inherent in the exception itself. Once the internee has turned over his possessions for safe keeping it is no longer possible that he may take them into jail.

Thus, correctional officers may conduct a reasonable search of an arrestee's person for this purpose, but may not further search the arrestee's possessions discovered and removed in that search in the absence of a warrant or circumstances which provide the basis for a more intensive search under another recognized exception to the warrant requirement.[24]

▬▬▬ In this case the correctional officer acted properly and constitutionally in conducting a pat-down search of Reeves' person and removing the object which he felt in Reeves' jacket pocket. However, the officer exceeded the constitutionally permissible limits of a search effected for the valid governmental purpose of preventing weapons, illegal drugs, and other contraband or potentially dangerous items from entering the jail when he searched the balloon and examined its contents. Whatever the contents of the balloon, once the balloon was removed from Reeves' person the institutional interest in regulating the jail environment was protected and no further intrusion was necessary.

Nor does the second valid governmental purpose which we have recognized, the protection of an arrestee's property and the related state interest in protecting against an arrestee's claims of loss or damage to his or her property, provide a justification for the exploratory search of the balloon conducted here. An arrestee's property can be sufficiently protected simply by placing it in a "property bag," as was apparently the practice at the jail involved here, or other segregated, secure place or container and storing it in a reasonable manner. If, as the state suggests,[25] there is some question whether any items of the arrestee's property are particularly fragile or perishable, or otherwise unamenable to normal storage and handling, the arrestee could so inform the correctional officer conducting the search in response to an appropriate inquiry. However benevolent the state's intentions in this regard, the possibility that an item of the arrestee's property might require special care, handling, or storage cannot serve as a justification for a general search of the arrestee's possessions.

▬▬▬ The state can also be fairly and reasonably protected from claims of loss or damage to an arrestee's property in its possession without an intensive exploratory pre-incarceration search. As we noted in our recent opinion in *State v. Daniel,* 589 P.2d 408, 415 (Alaska 1979), the state, as an involuntary bailee, has "only a 'slight' duty

---

**24.** In its brief on appeal, the state misconceives the intensity of the search necessary to effect this governmental purpose. The state argues that "the officer was justified in removing and examining the object to determine whether appellant [Reeves] was attempting to introduce contraband into the institution." However, a pre-incarceration inventory search cannot be justified as a general exploratory and investigatory search. We recognize only a non-investigative purpose and hold, accordingly, that that purpose is effected without "a general exploratory search of the belongings themselves." *State v. Kaluna,* 55 Haw. 361, 520 P.2d 51, 61 (1974).

As we have indicated, other exceptions to the warrant requirement may allow a more intensive search, including a properly conducted and limited search incident to arrest. See notes 10 and 11 *supra.*

**25.** The state offers the following hypothetical situation:

Normal storage conditions would involve a storage bag and deposit in a designated portion of the institution. For example, suppose that an arrestee had with him a box of frozen fish at the time of arrest. Are the officers forbidden to open the box, determine the nature of its contents, and make arrangements for proper storage?

of care" with respect to property in its possession because of the arrest of the property owner and this "duty could easily be met without extensive inventory."[26] The state can effectively insulate itself against fraudulent claims by simply listing by description any items of property taken from an arrestee; securing those items in a property bag or other secure storage container used in the facility, preferably in the arrestee's presence;[27] and obtaining the arrestee's signature acknowledging the correctness of the inventory so taken. If there is any question as to the contents of any container, the arrestee should be "consulted and offered the opportunity to request that an inventory be made of the contents" of such containers.[28] We think the above procedure and limited search fairly and reasonably protects the state against fraudulent claims.

In summary, we hold that a pre-incarceration inventory search is an exception to the warrant requirement, where it is conducted to further the governmental purposes recognized above and is limited to the extent necessary to respect Alaska's constitutional guarantee against unreasonable searches and seizures. The search of an arrestee's person should be no more intensive than reasonably necessary to prevent the entry of weapons, illegal drugs, and other contraband or potentially dangerous items into the jail. Any items taken from the arrestee's possession in this search may not be further searched or opened except pursuant to a search warrant or another recognized exception to the warrant requirement applicable in the circumstances. Finally, the inventory conducted shall consist of a cataloging of the arrestee's property thus seized and may not, without a specific request from the arrestee, extend to a search and inventory of the contents of *any* object, closed or sealed container, luggage,

---

**26.** In support of this proposition we cited *Mozzetti v. Superior Court,* 4 Cal.3d 699, 94 Cal. Rptr. 412, 417–419, 484 P.2d 84, 89–91 (1971), and 9 S. Williston, Law of Contracts § 1038A, at 905–07 (3d ed. 1967 and Supp.1978). *See also State v. Daniel,* 589 P.2d 408, 418 n.41 (Alaska 1979).

**27.** The correctional officer testified as to the institutional procedures in this regard at the suppression hearing in response to the trial judge's questions. The officer testified that while articles removed from the arrestee's person are placed in a property bag in the arrestee's presence, they are not inventoried in his presence. The inventory prepared out of the arrestee's presence at a later time is then given to the arrestee for his signature. The trial judge expressed some concern that this procedure might provide the opportunity for an arrestee to claim that the inventory was incorrect and that, perhaps, his property was stolen while the inventory was completed out of his presence.

It is for this reason that we suggest that the better practice would be to adequately inventory and then secure such property in the arrestee's presence immediately after the pre-incarceration search. This would serve more effectively to protect the state against fraudulent claims than the procedure apparently in use at the time of Reeves' arrest. *See also Zehrung v. State,* 569 P.2d 189, 191 (Alaska 1977) (detailing the procedure in the Anchorage jail as described in the correctional officer's testimony here).

**28.** *State v. Daniel,* 589 P.2d 408, 415, 417–18 n.41 (Alaska 1979).

*See State v. Kaluna,* 55 Haw. 361, 520 P.2d 51, 61–62 (1974), where the Hawaii Supreme Court reasoned:

The government's interest in protecting itself against fraudulent post-incarceration claims of loss or damage to property is at best a tenuous reason for infringing the privacy of an individual's belongings. Consequently, an inventory search should be rigidly circumscribed in scope, perhaps more so than any other type of justified warrantless search. To the extent that the basic purposes of an inventory search can be accomplished by means which are less intrusive on an internee's privacy, then the constitutional rule of reason requires such means to be employed. Certainly [the correctional officer] could have 'inventoried' the defendant's packet without opening it. For example, all of the defendant's belongings could have been tabulated and placed, unopened, into a sealed envelope at the time of her booking; the police might even have required the defendant to sign a waiver releasing them of responsibility for the contents of unopened items, thereby affording her a choice whether to relinquish her right of privacy in the packet's contents. [citations omitted]
*See also United States v. Robinson,* 414 U.S. 218, 258 n.7, 94 S.Ct. 467, 487 n.7, 38 L.Ed.2d 427, 454 n.7 (1973) (Marshall, J., dissenting).

briefcase, or package. We believe that a pre-incarceration search thus limited both adequately protects the reasonable interests of the state and appropriately respects an arrestee's reasonable expectation of privacy.

The search of the balloon taken from Reeves' jacket by the correctional officer exceeded the constitutionally permissible scope of a pre-incarceration inventory search. Therefore, the evidence thereby discovered and seized could not be admitted on the basis of the pre-incarceration inventory search exception to the warrant requirement.

While we have concluded that the correctional officer's seizure and search of the balloon was not within the scope of the governmental intrusion constitutionally permitted by the rationales underlying a pre-incarceration inventory search, the state asserts that this intrusion was justified under the "plain view" doctrine. The state argues that this doctrine gave the correctional officer "a right to seize the evidence which he observed from a lawful position."

As a fundamental rule, a search conducted without a properly obtained warrant is per se unreasonable unless it clearly falls within one of the narrowly defined exceptions to the warrant requirement.[29] One of these recognized exceptions is the plain view doctrine, which is concerned with the constitutional requirements in a situation where an officer of the government observes evidence from a place where he or she is legally entitled to be.[30]

In its purest application the doctrine does not deal with a search in a constitutional sense but simply sanctions the admission of evidence consisting solely of testimony as to the observations of an officer legally in the position from which the observations were made.[31] However, the more difficult cases deal with the permissibility of official action in seizing physical evidence observed in "plain view".

In analyzing these cases, we have recognized three basic requirements for a valid "plain view" seizure of evidence: (1) the initial intrusion which afforded the view must have been lawful; (2) the discovery of the evidence must have been inadvertent; and (3) the incriminating nature of the evidence must have been immediately apparent.[32] The first two of these re-

---

**29.** See note 20 supra.

**30.** This doctrine was most recently applied by this court in Klenke v. State, 581 P.2d 1119 (Alaska 1978), and Weltin v. State, 574 P.2d 816 (Alaska 1978), and has been defined and discussed in numerous other decisions by this court. See Feldman, Search and Seizure in Alaska: A Comprehensive Review, 7 U.C.L.A.—Alaska L.Rev. 75, 81–86 (1977). The most extensive discussion of the plain view doctrine by the United States Supreme Court was in the several opinions in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). See also Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). See generally Annot., Search and Seizure: Observation of Objects in "Plain View"—Supreme Court Cases, 29 L.Ed.2d 1067 (1971).

**31.** In Klockenbrink v. State, 472 P.2d 958 (Alaska 1970), for instance, we upheld the admission of the testimony of an Alaska Fish and Game enforcement officer concerning his observation of fishing activities on a commercial fishing vessel in closed waters. We held that the officer "was on board effecting a legal arrest after personally observing the commission of a misdemeanor" and that, therefore, the evidence based on his observations while on board the vessel was admissible. We noted that "[i]t is generally held that the mere observation of items which are in plain view or which are open and apparent is not a search." Id. at 961 (footnotes omitted). See also, United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927).

In Weltz v. State, 431 P.2d 502, 505 (Alaska 1967) (footnote omitted), we reiterated the following definition of a search in relation to such "mere observations":

A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way. While it has been said that ordinarily searching is a function of sight, it is generally held that the mere looking at that which is open to view is not a "search".

**32.** See, e. g., Klenke v. State, 581 P.2d 1119, 1121 (Alaska 1978). See also State v. Spietz, 531 P.2d 521, 523–24 (Alaska 1975); State v. Davenport, 510 P.2d 78, 84–85 (Alaska 1973). These requirements have been widely adopted re-

quirements are met in this case. The correctional officer saw the balloon while conducting a pre-incarceration inventory search and there is no evidence or allegation that the officer's discovery of the balloon was other than inadvertent. However, the question whether the third requirement is met in this case requires more extensive discussion.

The balloon seized by the correctional officer during the inventory search was opaque. We have quoted with approval Justice Traynor's statement in *People v. Marshall*, 69 Cal.2d 51, 69 Cal.Rptr. 585, 589, 442 P.2d 665, 669 (1968):

> It is inherently impossible for the contents of a closed opaque container to be in plain view regardless of the size of the container or the material it is made of. A search of the container is necessary to disclose its contents.[33]

The recognition of this fact does not end our inquiry, since it is not certainty but rather probable cause which is required to justify a plain view seizure.[34] Therefore, the question precisely posed in the context of this case is whether the correctional officer's seizure and search of the balloon was based on his reasonable judgment prior to the seizure that the balloon contained contraband, and whether that belief was grounded upon probable cause. Probable cause gained after the examination of the interior of the balloon cannot be used in retrospect to justify that seizure and examination.[35]

Thus, while the opaque quality of the balloon does not preclude a plain view seizure here, we must determine whether the correctional officer's seizure

from *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564, 582 (1971). *See, e. g., United States v. Berenguer*, 562 F.2d 206, 210 (2d Cir. 1977); *State v. Cook*, 115 Ariz. 188, 564 P.2d 877, 883 (1977); *State v. Parker*, 355 So.2d 900, 904 (La.1978); *State v. Lane*, 573 P.2d 198, 201 (Mont.1977); *State v. Williams*, 55 Ohio St.2d 82, 377 N.E.2d 1013, 1016 (1978); *State v. Murray*, 84 Wash.2d 527, 527 P.2d 1303, 1307 (1974).

**33.** We have quoted Justice Traynor's statement in *Anderson v. State*, 555 P.2d 251, 257 (Alaska 1976); *Erickson v. State*, 507 P.2d 508, 513 (Alaska 1973). *See also Schraff v. State*, 544 P.2d 834, 850 (Alaska 1975) (Rabinowitz, C. J., concurring and dissenting).

**34.** *Klenke v. State*, 581 P.2d 1119, 1123 (Alaska 1978). Justice Traynor's opinion in *People v. Marshall*, 69 Cal.2d 51, 69 Cal.Rptr. 585, 588, 442 P.2d 665, 668 (1968), appeared to reject such a standard for plain view seizures, stating: This contention [that probable cause for the seizure existed] overlooks the difference between probable cause to believe contraband will be found, which justifies the issuance of a search warrant, and observation of contraband in plain sight, which justifies seizure without a warrant. However strongly convinced officers may be that a search will reveal contraband, their belief, whether based on the sense of smell or other sources does not justify a search without a warrant. However, the California Supreme Court has subsequently recognized the probable cause standard and delineated the import of *Marshall* as a case in which "even probable cause based on the smell of contraband did not overcome

the presumed invalidity of a search of a dwelling for that contraband absent a warrant." *Guidi v. Superior Court*, 10 Cal.3d 1, 109 Cal. Rptr. 684, 695 n. 18, 513 P.2d 908, 919 n. 18 (1973). This is a distinction which underlies much of the confusion as to an "exigency" requirement for a seizure based on "plain view" information which can be effected only by an otherwise unauthorized intrusion into a constitutionally protected area. *See State v. Spietz*, 531 P.2d 521, 523, 525–26 (Alaska 1975); *Erickson v. State*, 507 P.2d 508, 513–14 (Alaska 1973).

This probable cause standard is generally accepted. *See United States v. Clark*, 531 F.2d 928, 932 (8th Cir. 1976); *United States v. Williams*, 385 F.Supp. 1400, 1405 (E.D.Mich.1974); *Shipman v. State*, 291 Ala. 484, 282 So.2d 700, 704 (1973); *State v. Cook*, 115 Ariz. 188, 564 P.2d 877, 883 (1977); *Bynum v. United States*, 386 A.2d 684, 687–88 (D.C.App.1978); *Carr v. State*, 353 So.2d 958, 959 (Fla.App.1978); *State v. Wilson*, 279 Md. 189, 367 A.2d 1223, 1227–28 (1977); *Commonwealth v. Hawkins*, 361 Mass. 384, 280 N.E.2d 665 (1972); *People v. Ridgeway*, 74 Mich.App. 306, 253 N.W.2d 743, 745 (1977); *State v. Beaver*, 37 N.C.App. 513, 246 S.E.2d 535, 539 (1978); *State v. Hoggans*, 35 Or.App. 669, 582 P.2d 466 (1978); *City of Warwick v. Robalewski*, 385 A.2d 669, 672 (R.I. 1978); *Armour v. Totty*, 486 S.W.2d 537, 539 (Tenn.1972); *State v. McGovern*, 77 Wis.2d 203, 252 N.W.2d 365, 369 (1977).

**35.** *See, e. g., Bumper v. North Carolina*, 391 U.S. 543, 548 n. 10, 88 S.Ct. 1788, 1791 n. 10, 20 L.Ed.2d 797, 802 n. 10 (1968).

was based on probable cause.[36] In making this determination, we consider the correctional officer's testimony at the suppression hearing as well as the totality of the circumstances in which this seizure occurred. The state bears the burden of proof and thus it must appear by a preponderance of the evidence that the seizure and search of the balloon in this case was supported by the requisite probable cause.[37]

The correctional officer testified at the suppression hearing that he had "a feeling" that the "brownish, sort of whitish colored substance inside" the balloon might have been contraband, but at no point did he testify that he had cause to believe the balloon contained contraband prior to opening it and observing its contents. On the contrary, he testified that he was unable to tell what, if anything, was inside the balloon when he originally removed it from Reeves' jacket.[38] It appears from his testimony that he opened the balloon and examined its contents not because he believed it to be contraband, but simply pursuant to the standard inventory routine at the jail.[39]

**36.** A distinction based on the transparency or opacity of a container in which contraband is seized has a certain appeal in the context of a legal doctrine termed the "plain view" doctrine. However, it is not difficult to conceive of situations in which an opaque container (such as a box labelled as containing illegal drugs) might be more apparently and probably incriminating than a substance in plain view (such as a clear jar of white powder in a suspect's kitchen). The requirement of probable cause does not rest solely on this distinction of appearance but contemplates the full range of information on which an officer's conduct in seizing the object seen is based.

**37.** While in *Bell v. State*, 519 P.2d 804, 808 n. 13 (Alaska 1974), we found an officer's seizure to be supported by "clear and convincing" evidence of the presence of contraband within the seized package, the majority opinion expressly reserved the question "whether some lesser standard, such as probable cause, would suffice." Subsequently, in *Schraff v. State*, 544 P.2d 834, 838 (Alaska 1975), we held that the state must justify a plain view seizure with proof by a preponderance of the evidence.

**38.** The correctional officer testified in part as follows:

Q Did he remove it from his pocket, or did you?
A No, I did.
Q And was there—what was the substance you removed? I mean what did it look—physically look like?
A It was a small, rolled up, bluish, maybe green, balloon rolled up maybe about a half an inch in diameter, and I unrolled the balloon and I noticed there was like a brownish, sort of whitish colored substance inside, which I then handed to the desk officer.
Q Did you have a feeling that that might be some kind of contraband?
A I did.

    *    *    *    *    *    *

Q Mr. Martin, when you first discovered the balloon you say it was rolled up?
A It was.

Q And it was blue-green?
A I believe so, yes.
Q Was it opaque?
A I cannot recall at this moment.
Q If your testimony in front of the grand jury indicated it was opaque, that would be accurate as far as your recollection at that time?
A Yes, it would.
THE COURT: Well, let's see if everybody understands what opaque is now, including myself.
Q Well, opaque as opposed to transparent. In other words, looking at the balloon could you see through it?
A No, you could not.
Q When you looked at it when it was originally removed from the jacket you could not tell what was inside it, is that correct?
A No, I could not.
Q And it was only through the unrolling of the balloon that you could discover that there was a substance contained within it?
A That is correct.

**39.** The correctional officer's testimony at the suppression hearing in response to the questions of the trial judge was, in part, as follows:

Q All right. Let me ask you this then, at the stage that you actually make the receipt, what do you do in case, to give you an example, let's assume you have a ring-size box. You know what those are.
A Yes. Yes.
Q Maybe a half an inch by half an inch or an inch.
A Yes.
Q And it's closed. Do you give him a receipt just for a box, or do you look in that box and see what's in it?
A No, we look inside the box—inside the box and it is listed.
Q Well, now have you had an experience in the past of people having balloons wrapped up in their pocket.
A No, I have not.
Q Well, anything else other than a balloon? Have you had anything else that was

Furthermore, the officer had at that time been employed at the jail only two months and testified that he had had no "experience in the past of people having balloons wrapped up in their pocket."[40]

Nor do the circumstances of the seizure provide an inference that the officer acted from probable cause rather than mere suspicion, curiosity, or routine. Reeves was arrested for a traffic offense and neither the correctional officer nor the arresting officer had knowledge of Reeves' use or possession of drugs at the time the balloon was seized and examined.[41] There was no other evidence found on Reeves' person at that time which would lend support to a conclusion that the balloon contained contraband.[42] The record simply does not support a conclusion that the incriminating nature of the balloon was immediately apparent to the correctional officer prior to the seizure and search challenged by Reeves.

Our conclusion on these facts is identical to that reached by the Texas Court of Criminal Appeals in *DeLao v. State*, 550 S.W.2d 289 (Tex.Cr.App.1977). In *DeLao*, an officer seized a red balloon on the window sill of an arrestee's residence and it was later discovered to contain heroin. The *DeLao* court ruled that this balloon was not seized as contraband in plain view. While the court recognized that it is a "well known fact perhaps" that such balloons are used as containers for heroin, it held that the state failed to meet its burden of proof.

> The officer's testimony . . . does not demonstrate that he was cognizant of this 'well known' fact or immediately aware that heroin was in the balloon at the time of seizure.[43]

■ Based on our consideration of the evidence received at the suppression hearing and the record as a whole, we hold that the state did not meet its burden of proving that the seizure and search of the balloon was supported by the probable cause required by the plain view exception to the warrant requirement.[44] The evi-

---

wrapped up? Have you opened it up to see what was in it to list it?

A Yes, I've had numerous handkerchiefs and various other scarves and . . .

Q And what . . .

A . . . other articles and I've always unwrapped these.

Q Is that the usual procedure?

A That is the usual procedure.

**40.** *Compare Schraff v. State*, 544 P.2d 834, 847 (Alaska 1975) (trained narcotics investigator testified that foil packet was identical to "slips" used to carry illicit drugs, that he had never seen a "slip" not used for that purpose, and that he "therefore concluded that the foil packet undoubtedly contained illicit drugs"); *Bell v. State*, 519 P.2d 804, 808 (Alaska 1974) (officer with "training in drug and narcotics identification believed vegetable material to be marijuana); *Daygee v. State*, 514 P.2d 1159, 1162–63 (Alaska 1973) ("The officer, who had extensive training in detecting marijuana, testified that he recognized the smell of marijuana burning and the substance in the [clear plastic] bag looked like marijuana, which he had seen previously.")

**41.** While the police officer's testimony at the suppression hearing left room for an inference that he had some suspicions that Reeves was "under the influence of something" in addition to alcohol. Reeves was charged only with driving while under the influence of intoxicating liquor. Furthermore, the police officer's report did not indicate any such suspicions, but only noted a strong liquor odor and the breathalyzer results.

**42.** *Compare Weltin v. State*, 574 P.2d 816, 820–21 (Alaska 1978), where we upheld the seizure of a clear glass vial containing a white powder as a valid "plain view" seizure. The officer also seized a bent nail "flattened at the end to resemble a spoon shape." We noted that since cocaine "is often ingested by sniffing out of a small spoon," this further supported the officer's conclusion that the white powder was contraband.

**43.** *DeLao v. State*, 550 S.W.2d 289, 291 (Tex. Cr.App.1977). It is noteworthy that in *DeLao* the suspect was arrested for possession and sale of heroin, while Reeves was taken into custody for a traffic offense.

**44.** Probable cause in this context requires that "the facts and circumstances within the [officer's] knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe" that the balloon contained contraband prior to opening it. *Keller v. State*, 543 P.2d 1211, 1215 (Alaska 1975), *quoting Berger v. New York*, 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040, 1050 (1967). Probable cause thus represents an objective legal standard by which this court measures

dence gained as a result of that seizure and search was unconstitutionally obtained and is not admissible.

REVERSED.

BOOCHEVER, C. J., and MATTHEWS, J., dissent.

BOOCHEVER, Chief Justice, with whom MATTHEWS, Justice, joins, dissenting.

I agree with the majority's statements of the requirements for a valid plain view seizure of evidence: (1) the initial intrusion which afforded the view must have been lawful, (2) the discovery of the evidence must have been inadvertent, and (3) the incriminating nature of the evidence must have been immediately apparent.

I also agree with the test set forth in the opinion for determining whether the incriminating nature of the evidence is immediately apparent: "[I]t is not certainty but

rather probable cause which is required to justify a plain view seizure."

I do not think, however, that the evidence enables us to conclude that the correctional officer's seizure and search of the balloons was not based on his reasonable judgment prior to the seizure that the balloon contained contraband. The questioning of the officer was not directed to this issue. In a context which was not entirely clear,[1] however, he was asked:

Q. Did you have a feeling that that might be some kind of contraband?

A. I did.

The officer probably was able to detect the powder-like nature of the substance contained in the balloon when he removed the balloon from Reeves' possession. Nowadays, it is almost inconceivable that a powder-like substance rolled up in a balloon taken from a person who is found driving while intoxicated would not be some type of

---

the reasonableness of an officer's decision to undertake a search. *See, e. g., United States v. Winer*, 294 F.Supp. 731, 734 (W.D.Tex.1969). " 'The question of the reasonableness of the officer's conduct is determined on the basis of the information possessed by the officer at the time a decision to act is made.' " *People v. Gale*, 9 Cal.2d 788, 108 Cal.Rptr. 852, 858, 511 P.2d 1204, 1210 (1973) (en banc). The officer in this case, therefore, must have had sufficient knowledge to form an actual, subjective belief that the balloon contained contraband prior to opening it or his actions cannot be termed reasonable. " '[I]t would be a logical absurdity for the courts to be asked to determine the reasonableness of an officer's belief that that particular crime had been committed unless it were first established that the officer did entertain such a belief.' " *People v. Miller*, 7 Cal.3d 219, 101 Cal.Rptr. 860, 865, 496 P.2d 1228, 1233 (1972) (en banc), *quoting, Agar v. Superior Court*, 21 Cal.App.3d 24, 98 Cal.Rptr. 148, 150 (1971). *See also In re Tony C.*, 21 Cal.3d 888, 48 Cal.Rptr. 366, 368, n. 2, 582 P.2d 957, 959 n. 2 (1978). We reject cases which suggest a contrary analysis. *See United States v. Kelly*, 414 F.Supp. 1131, 1136 (W.D.Mo.1976), *rev'd on other grounds*, 547 F.2d 82 (8th Cir. 1977) ("The mere fact that the officer who conducted the search . . . did not immediately recognize the incriminating [nature] of [the seized items] is immaterial because the evidence must be considered as it would have appeared to a reasonable police officer."). *See also DeLao v. State*, 550 S.W.2d 289, 292 (Tex.Cr.App.1977) (dissenting opinion).

Any other approach is unsound, particularly in the context of plain view seizures. We have often reviewed the reasonableness of a plain view seizure in light of the seizing officer's special experience and knowledge. *See* note 40 *supra*. As a necessary corollary, "[i]t is fundamental that an officer's observations can give rise to probable cause only if that officer had sufficient training and experience from which to draw the conclusions necessary to create a reasonable belief in the presence of contraband." *Wimberly v. Superior Court*, 16 Cal.3d 557, 128 Cal.Rptr. 641, 646, 547 P.2d 417, 422 (1976). Perhaps even more fundamental, it would be incongruous to allow a seizure under the plain view *exception* to the warrant requirement where the seizing officer, based on his or her knowledge, would not have sought a warrant.

As Chief Justice Boochever says in his dissent, there was some ambiguity in the correctional officer's testimony. However, we think the only fair inference which can be drawn from the officer's testimony, taken as a whole, is that he did not have a reasonable belief, based on his personal knowledge and experience, that the balloon contained contraband until *after* he opened it and observed its powdered contents. *See* notes 38 and 39 *supra*.

1. The testimony may have referred to the powdery substance removed from the balloon, as opposed to the unopened balloon with its unrevealed contents.

illicit drug. Conceivably, it could be talcum powder, but that strains credulity. Certainly, a trial court could consider these facts in determining whether there was probable cause for a correctional officer to be justified in assuming that a tightly rolled one-half inch balloon packet contained drugs.

I, therefore, would remand the case for a further hearing on the issue of whether or not the correctional officer's seizure and search of the balloon was based on his reasonable judgment prior to that search that the balloon contained contraband, and whether that belief was grounded upon probable cause.

